[L. A. No. 16677. In Bank.—September 29, 1938.]

ULYSSES E. METHEVER, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Ulysses E. Methever, *in pro. per.*, for Petitioner.

Philbrick McCoy for Respondent.

THE COURT.—On June 28, 1937, Gertrude E. Kamla, wife to Peter Kamla, made complaint to local administrative committee number nine of The State Bar of California, charg-

ing petitioner, a member of said State Bar, with defrauding complainant and her husband of the sum of three hundred dollars by a scheme devised by him, whereby he was to form a Nevada corporation in which the Kamlas and petitioner and his wife, as majority stockholders, were to engage in the business of raising for market purposes sheep, cattle, hogs and all kinds of poultry on a somewhat extensive scale.

Peter Kamla was an oil worker and spent most of his time in the oil fields of Kern County. His wife resided in Los Angeles, and the husband spent as much time as his employment would permit at their Los Angeles home. They owned three hundred and twenty acres of unimproved land near Barstow, San Bernardino County. On September 22, 1935, they caused an advertisement to be published in a Los Angeles city newspaper, as follows: "Partner. Ideal location for sheep ranch, need partner with capital. 10253 San Miguel, South Gate."

The advertisement came to petitioner's attention and he contacted Mrs. Kamla and she interested her husband in petitioner's proposition to form a corporation and issue capital stock in the sum of $100,000, of which the Kamlas and petitioner and his wife were to own 51,000 shares of stock, and the remaining 49,000 shares were to be sold to the public to raise funds to finance the project. Petitioner was to be the president of the corporation, Kamla, vice-president, and Mrs. Kamla and petitioner's wife, treasurer and secretary, respectively. The proposition was entirely the scheme of petitioner. The Kamlas knew nothing about the organization or functioning of a corporation, and were guided wholly by the advice of petitioner, who represented himself as being well experienced in the organization and promotion of corporations. The capital necessary to operate the corporation was to be raised by the Kamlas deeding to the corporation their 320 acres of land, and by petitioner deeding a like acreage to the corporation, in consideration of which they were to hold 51,000 shares. The proceeds of the remaining 49,000 shares which were to be sold to the public were to be used in purchasing livestock and equipping the lands for production.

Petitioner had several conferences with Mrs. Kamla, who seemed to have been impressed with his proposals by reason

of his representation that he was experienced in the law of corporate organization, and his further representation that he had a thorough knowledge of stock and poultry raising, and that he was in close connection with the stock-raising industry. Mrs. Kamla testified that when she first called on petitioner at his request she told him that she and her husband were looking for a partner to help finance the sheep business. Petitioner said he did not have any money, but he was a "corporation lawyer", and that he had incorporated many companies, and he advised that they incorporate and sell shares and raise money in that way. She further testified that the proposition was all new to her, and she told him she would have to consult her husband about the incorporation proposal. Petitioner asked her to bring her husband to see him when he should next return home. Some two weeks thereafter, on a Sunday morning, she and her husband called on petitioner, as requested by him, and petitioner disclosed to them his proposal and showed them a book containing pictures of cattle and sheep. He told them he was experienced in the stock-raising business and that he would go in with them as a partner in the business; that he would put in an equal amount of money and equal acreage with them; that he had 400 acres of land in the San Joaquin Valley. Mr. Kamla told him he would think it over. Petitioner told them that he would come to the Kamla home that evening and explain more fully his proposition to them. He arrived in the evening, taking with him a scrap-book containing pictures of cattle and sheep and hogs, which were pasted in the book.

Mr. Kamla asked him what he expected as a fee for his services as a lawyer, and petitioner said he would make no charge for his services in forming the corporation. Mr. Kamla told him he could not pay anything as he did not have any ready money. He then asked him what would happen if the corporation was not formed, and petitioner assured him that he would get his money back. Petitioner advised that the corporation be formed at Las Vegas, Nevada, and that the incorporation costs would be $600, each party to put up $300. Petitioner was asked if any part of that sum was to be used in promotion, and he replied that it would be necessary to get out some literature which would cost $27,

and the balance would be expended solely as costs incurred in obtaining articles of incorporation.

Mr. Kamla went to Bakersfield, and the next morning Mrs. Kamla went to petitioner's home and gave him a check for $150. Petitioner said he would go to Las Vegas as soon as she paid the balance and effect incorporation of the entity to be known as the "Tally-ho Livestock Farms, Inc." The balance of the $300 was paid by Mrs. Kamla within three months thereafter. Petitioner never went to Las Vegas nor formed the corporation, nor paid his share of the costs, nor made any satisfactory explanation as to how he expended the sum of $300 which he took from Mrs. Kamla to be applied as costs in forming the corporation. After it became apparent that he had no serious thought of forming a corporation, and had made no *bona fide* effort to do so, the Kamlas made a demand upon him for the return of the $300 which petitioner had collected from them. Mr. Kamla obtained a judgment against him in the sum advanced, which he has not been able to satisfy.

The feeble defense which the petitioner made to the accusations proffered by the local committee does not deserve extended review. Petitioner attempted to justify his retention of the $300 as an attorney fee by virtue of the following paragraph of a contract prepared by petitioner and signed solely by Mrs. Kamla and petitioner: "That all parties herein performing service in forming and maintaining said corporation are to receive compensation therefor."

The foregoing paragraph is immediately preceded by the following paragraph: "That the parties hereto are to pay the costs and expenses necessary to form and finance said cattle and poultry company, not to exceed the sum of Six Hundred Dollars."

It is the claim of Mrs. Kamla that at the time petitioner read to her a purported memorandum of the agreement prepared by him the paragraph above quoted providing for the payment of services was not mentioned; that it was inserted afterwards as a part of the contract which she signed with the understanding on her part that it was the same in all material respects as the memorandum which he had read to her. The husband never saw nor signed the contract. In fact, petitioner testified that he did not think anything was

said by him about the payment of attorney's fees in his estimate of the costs of organization.

He attempted to account for the expenditure of the $300 received from Mrs. Kamla, but in doing so made no claim or pretense that any portion of said sum was to be used in payment of attorney's fees. His testimony is inconsistent with any claim or suggestion that he regarded any part of the $600 expense fund subject to the payment of attorney's fees. He testified that the $600 was "for the expense to form the corporation". Again, "Q. What was the conversation relating to that $600? A. Well, we figured out it would cost about $600 expense to form the company and get it on a paying basis to start. Q. Filing articles. A. Filing articles and I told them if we had to hire an attorney [petitioner had prior to this testified that he had no recollection of anything being said about the payment of attorney's fees] anybody that was to do the work was to get paid. *After* the company was *formed* we all expected to get paid. I was corresponding with a man in Texas who wanted to go into the cattle business with us. He had a large ranch. If I did the work I would draw a plan. When it comes to paying me for services, the same as some other lawyer we would get, they didn't see it that way. I guess they didn't see it. Finally when I found out I couldn't go ahead with it they wanted their money back and I figured I had done some services. I had spent cash and it should be reimbursed."

Petitioner owned no land which he could put into the project. He furnished no part of the $300 which he was to put in the proposed enterprise. He kept no account of moneys claimed to have been expended by him in a futile and purposeless attempt at organizing the corporation. The services rendered by him were worthless. The whole project was a sham. Petitioner retained for himself practically the entire fund paid for organization purposes and paid nothing on his own account.

The evidence amply supports the findings and the recommendation of the board of governors of The State Bar suspending petitioner from the practice of the law in this state for a period of one year on the ground that his conduct as described by the evidence amounted to and involved moral turpitude on his part as defined by the decisions of this state.

The recommendation of said board of governors is hereby approved and adopted by this court and petitioner is accordingly suspended from the practice of the law for a period of one year, effective thirty days from the filing of this order. It is so ordered.